**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| VAN ZENG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>DATAVAULT AI INC., BRETT MOYER, NATHANIEL T. BRADLEY, and GARY WILLIAMS,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Van Zeng ("Plaintiff") on behalf of himself and all others similarly situated, by and through Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Datavault AI, Inc. ("Datavault AI" or the "Company"), the Company's press releases, analyst reports, media reports, and other publicly disclosed information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action brought on behalf of all persons and entities who purchased or otherwise acquired Datavault AI common stock between September 4, 2024 and August 18, 2026, inclusive (the "Class Period"), against Datavault AI and certain of its senior officers[1] to recover damages caused by Defendants' violations of the federal securities laws. Plaintiff brings this federal class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2. Datavault AI is a technology licensing company that owns a portfolio of patented, secure platforms designed to redefine how data is managed, valued, and monetized in the modern era. Leveraging the Company's proprietary high-performance computing ("HPC") capabilities and software, Datavault AI's technology offerings are purportedly designed to ensure data ownership immutability, experiential data observability, precise data asset valuation, and secure monetization. "Datavault AI has two synergistic platforms—Data Sciences and Acoustic Sciences—that [its] executive leadership is focusing on as key drivers of future revenue growth."

3. Datavault AI purportedly owns and operates data management platforms including its Datavault Platform, on which users may purchase or sell data tokenized using blockchain

[1] "Defendants" is defined and identified at ¶¶21-27.

technology. As of the time of this filing, Datavault AI continues to claim that the Datavault Platform enables "organizations [to] turn data into a strategic asset."

4. Datavault AI was previously known as WiSA Technologies, Inc. ("WiSA"). On September 4, 2024, WiSA issued a press release announcing that it had agreed to acquire the intellectual property of Data Vault Holdings Inc. ("Data Vault Holdings"), including, inter alia, the Datavault Platform, for $210 million. WiSA further announced that, upon closing this acquisition, it intended to change its name to "Datavault Inc." and to appoint Defendant Nathaniel T. Bradley ("Bradley") as its Chief Executive Officer ("CEO"), and Defendant Moyer touted Bradley's "exceptional track record of successfully commercializing IP for five companies over 30 years." Defendants did not disclose that, three years earlier, the SEC had sued Bradley over false press releases issued by Parallax Health Sciences, Inc. ("Parallax"), where Bradley was Chief Technology Officer and a director, or that Bradley had consented to a judgment requiring him to pay a $40,000 civil penalty and prohibiting him for three years from participating in any offering of penny stock. Nor did Defendants disclose that Edward Withrow III ("Withrow"), who is named as an inventor alongside Bradley on a family of patents originally assigned to Data Vault Holdings, is a convicted felon, having pled guilty to making false statements to the SEC during its investigation of a scheme to manipulate the stock of Endeavor Power Corporation, the company that was renamed Parallax Health Sciences, Inc. and that later employed Bradley.

5. On February 13, 2025, following its acquisition of the Datavault Platform, WiSA announced that it had changed its name to Datavault AI.

6. On July 22, 2025, Datavault AI announced a corporate partnership with Burke Products ("Burke"), claiming that the partnership "stands to deliver 2025 Revenues from existing contracts of Burke's that have now been subcontracted to Datavault AI" and that Datavault AI was "uniquely positioned to deliver . . . new and innovative solutions" through "technological synergies" given the defense sector's "increas[ed] focus[] on secure data solutions, advanced tracking, and predictive intelligence."

7. On September 25, 2025, Datavault AI issued a press release announcing: "Datavault AI Secures $150 Million Strategic Investment from Scilex Holding Company to Build

Supercomputer and Launch Independent Data Exchanges in the US." According to the Company's release, the corporate partnership with Scilex Holding Company ("Scilex") would provide the Company with a "$150 million strategic investment" from Scilex "to strengthen Datavault AI's balance sheet and provide growth capital to accelerate its supercomputing infrastructure, expand independent data exchanges, and unlock new revenue streams." Defendant Bradley celebrated that the partnership with Scilex that "will also support the continued development of previously announced platforms, including the International Elements Exchange, International NIL Exchange, and American Politics Exchange." The strategic investment "will be made in two tranches, with an initial tranche of $8,067,000, expected to close on September 26, 2025, and a second tranche of $141,933,000 expected to close following receipt of stockholder approval."[2]

8. On October 28, 2025, Datavault AI announced a corporate partnership with Nature's Miracle Holding Inc. ("Nature's Miracle"), a sustainable agriculture and environmental technology company. Pursuant to the agreement, "Nature's Miracle will license Datavault AI's patented Carbon Credit Tokenization System, enabling it to develop, distribute, and commercialize blockchain-powered carbon credit solutions worldwide," and in return Datavault AI would "receive a non-refundable license fee of $2 million and a 35 percent royalty on all gross revenue generated through the licensed technology."

9. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had overstated the economic value to Datavault AI of its various corporate partnerships with, e.g., Burke, Scilex, and Nature's Miracle; (ii) Defendants had overstated the volume of trading activity on the Datavault Platform, which in fact was minimal; (iii) the Company's undisclosed connections with Withrow, a convicted felon, when revealed, would cause Datavault AI to incur reputational harm; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

[2] The next day, September 26, 2025, the Company "announced the closing of the initial tranche of the previously announced $150 million Bitcoin (BTC) investment."

10. The truth began to emerge on October 31, 2025, when Wolfpack Research published a research report on Datavault AI (the "Wolfpack Report"). The Wolfpack Report alleged, among other things, that Datavault AI was a "stock promotion" that relied on misleading press releases and "empty claims" concerning artificial intelligence, quantum computing, Web 3.0, and data monetization. Wolfpack further alleged that (i) Datavault AI's press releases were filled with promotional buzzwords that did not reflect the Company's actual business operations, (ii) Datavault AI's previously announced purported partnerships could not offer the economic upside that Defendants claimed they would, (iii) Burke's contracts concerned "run-of-the-mill equipment such as hoses, piping, fuses, and electrical connectors," undermining Datavault AI's claim that it was "uniquely positioned to deliver" solutions, and (iv) both Scilex and Nature's Miracle lacked the resources to fulfill their purported commitments pursuant to the partnerships Datavault AI had announced. The Wolfpack Report also questioned the activity on the Company's blockchain marketplace, alleging that Datavault AI's platform had virtually no trading activity. In addition, the Wolfpack Report raised concerns about Datavault AI's leadership and affiliations, including Defendant Bradley's past SEC charges for false statements concerning Parallax and Company leadership's alleged connections with convicted felon Withrow, through both Data Vault Holdings and Parallax.

11. On this news, Datavault AI's stock price fell $0.49 per share, or 19.44%, to close at $2.03 per share on October 31, 2025.

12. Defendants denied the allegations and warnings in the Wolfpack Report, and thereafter, they continued to make false and/or misleading statements and/or failed to disclose that: (i) Defendants had overstated the economic value to Datavault AI of its various corporate partnerships with, e.g., Scilex, Burke, and Nature's Miracle; (ii) Defendants had overstated the status and volume of trading activity on the Datavault Platform, which was in fact minimal; and (iii) Defendants had misrepresented the Company's working capital and liquidity position, and the Company's ability to continue as a going concern had not been alleviated.

13. Then, on August 19, 2026, before the market opened, Datavault AI issued its Q2 2026 results for the quarter ended June 30, 2026. The Company announced poor results, including

a loss of $0.12 per share, far worse than the expected $0.03 loss, and a net loss of $88 million for Q2 2026, more than twice the $37.1 million loss reported a year earlier.

14. On this news, Datavault AI's stock plummeted by 23.40% in a single day, on extremely high trading volume of more than 201 million shares as investors digested the $190 million revenue gap required to meet the full-year target, and further confirmation that, despite their prior assurances, they were still in the process of "assembling the technology, infrastructure and strategic capabilities required to bring Datavault AI's platform to market at scale," that only recently had "the foundation of [Datavault AI's] platform" taken shape, "the core platform buildout" was still underway, and the Company would not be launching its exchanges or "converting our contracted opportunities into commercial activity and recognized revenue" until the second half of 2026. The Company then also announced that its net cash and liquidity position ***"raise[s] substantial doubt about the Company's ability to continue as a going concern for the twelve months from the date that the financial statements are issued***. . . . As a result, ***the substantial doubt about the Company's ability to continue as a going concern has not been alleviated***."

15. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class[3] members have suffered significant losses and damages.

## I. JURISDICTION AND VENUE

16. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

18. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Datavault AI is headquartered in this District,

[3] "Class" defined *infra*, at ¶ 90.

Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

19. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## II. PARTIES

20. Plaintiff Van Zeng, as set forth in the attached Certification, acquired Datavault AI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

21. Defendant Datavault AI is a Delaware corporation with principal executive offices located at One Commerce Square, 2005 Market Street, Suite 2400, Philadelphia, PA 19103. The Company's common stock trades in an efficient market on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "DVLT." From the beginning of the Class Period until February 2025, Datavault AI was known as WiSA. As WiSA, the Company's common stock traded in an efficient market on the NASDAQ under the ticker symbol "WISA."

22. Defendant Brett Moyer ("Moyer") served as Datavault AI's CEO from before the start of the Class Period until December 31, 2024, when he transitioned to Chief Financial Officer, remaining in that role through the end of the Class Period.

23. Defendant Nathaniel Bradley served as Datavault AI's CEO from December 31, 2024 through the end of the Class Period.

24. Defendant Gary Williams ("Williams") served as Datavault AI's Chief Accounting Officer from before the start of the Class Period until November 30, 2024.

25. Defendants Moyer, Bradley, and Williams are collectively referred to herein as the "Individual Defendants."

26. The Individual Defendants possessed the power and authority to control the contents of Datavault AI's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Datavault AI's SEC filings and press releases

alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Datavault AI, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

27. Datavault AI and the Individual Defendants are collectively referred to herein as "Defendants."

## III. SUBSTANTIVE ALLEGATIONS

### A. Defendants' Materially False and Misleading Statements

28. The Class Period begins on September 4, 2024, when WiSA announced the purchase of Data Vault Holdings' intellectual property including, inter alia, the Datavault Platform. In its press release titled "WiSA Technologies Executes $210 Million Definitive Agreement to Purchase Assets, Including High-Performance Computing (HPC) Software and Acoustic Technologies IP, from Data Vault Holdings Inc.," WiSA described the Datavault Platform and claimed that it "creates value through scarcity, utility, and encrypted data protection and generates revenue through licensing partnerships."

> About the Datavault Platform
>
> Datavault's software and encryption enables a comprehensive solution for managing and monetizing data in the Web 3.0 environment. It allows risk-free licensing of name, image, and likeness (NIL) by securely attaching physical real-world objects to immutable metadata or blockchain objects, fostering responsible AI with integrity. Datavault's solutions ensure privacy and credential protection. They are completely customizable and offer AI and ML automation, third-party integration, detailed analytics and data, marketing automation and advertising monitoring.
>
> The platform creates value through scarcity, utility, and encrypted data protection and generates revenue through licensing partnerships that provide detailed analytics, sophisticated HPC modeling, digital ownership, tokenization, and advertising, among other means.

29. In the same press release, Defendant Moyer highlighted Defendant Bradley's purported "exceptional track record of successfully commercializing IP for five companies over 30 years," which Defendant Bradley echoed, while both omitted Bradley's past SEC charges for false statements concerning Parallax and subsequent three-year ban from participating in penny stock offerings:

> "This exciting transaction leverages our public company structure, creating a larger, more dynamic entity with broad reach in multiple, rapidly growing markets," said Brett Moyer, CEO of WiSA Technologies. "Datavault's substantial IP portfolio significantly amplifies our spatial audio technology and adds powerful HPC assets. Further, Nate Bradley brings his exceptional track record of successfully commercializing IP for five companies over 30 years. . . ."
>
> Nathaniel T. Bradley, CEO and co-founder of Data Vault Holdings, said, "I have repeatedly monetized patent portfolios via licensing models. Now, our Data and Acoustic Sciences are ready for commercial expansion. Already, our applications, including secure tokenization, data ownership and digital twin, have attracted reputable users, and our increased industry awareness positions us to expand our customer base."

30. WiSA also announced that, upon closing of the $210 million transaction, which needed shareholder approval, the Company would change its name to "Datavault Inc."

31. On November 15, 2024, WiSA held a conference call to discuss its financial results for the fiscal quarter ended September 30, 2024, as reported on a Form 10-Q it had filed with the SEC one day earlier. During this call, Defendant Bradley discussed his background but omitted any mention of past SEC charges for making false statements during his time at Parallax, stating in part:

> My background for those that don't know me is centered around invention. I have successfully taken products from invention to commercialization and into the public markets. Over my life span, I've had various timings that I have figured out with respect to this. You get better in life or at least you intend to, and this current opportunity follows really a career that is highlighted by our solution of the Internet for people with disabilities at Audioeye, my previous company, ticker AEYE, NASDAQ-traded company. We solve for making mobile and Internet sites accessible for those with disabilities.

32. Later during this call, when asked about the "near-term monetization drivers" on which he was "most focused" or conceived of as "most meaningful," Defendant Bradley touted

the purported commercial value of the Datavault Platform in visualizing scientific data and serving as an exchange on which users could sell data, stating *inter alia*:

> Datavault, the high science, the ability to use the holograms of HYPERVSN that we are — with the DVHolo brand, bringing a pay-per-view gateway experiential layer around the use of holograms and high science. So, that's using scientific data that we proved and showed at an exhibit at the Digital Twin Institute that we were able to show a plant being grown off of the data into it. So, you see a sun cycle into a seed. . . . Datavault is focused on an exchange. We have the ability with our information data exchange to simplify all of that business into an exchange. We sell data on behalf of our clientele in a safe and secure environment that's never existed before on our information data exchange. So, [that is] the focal point[], . . . the information data exchange . . . .

33. Defendant Bradley was then asked, "how do you actually monetize [the Datavault Platform]" and "what kind of visibility will analysts be able to see" to which he responded, "partnerships on the buy and sell side," confirming that "you will see a number of clients sign into the platform," highlighting that the Datavault Platform was "the flagship property of WiSA and Data Vault," and explaining that any monetization from the Datavault Platform would flow from transactions actually executed on it:

> … So partnerships on the buy and sell side. So, you will see a number of clients sign into the platform. We're at the commercialization stage of Data Vault. It's the flagship property of WiSA-Data Vault. . . .
>
> But the monetization, to answer your question, on the information data exchange, you could expect a 70-30 split, 30% of the yield of a trade, think of it as 15% buy-side, 15% sell-side interest in that data set comes back to our company. So, a 70-30 split, 30% coming to Data Vault, 70% in the pocket of our client, where we've taken, like Bloomberg does, a terminal, and we have a virtual meta terminal that we turn up for our clients called Datavault.
>
> And what we add for our clients to their data sets is a meta layer that adds value. So we value and score…
>
> So both sides announcing, buy and sell-side, and then the events and venues and the use of ADIO being other areas that we'll announce. And when we do announce those, keep in mind, Data Vault is the back end. All of those ad systems and other systems are really built for the purpose of creating data, and we harness that at Data Vault.

34. On January 7, 2025, WiSA announced it had closed its purchase of Data Vault Holdings' intellectual property, including the Datavault Platform, and named Defendant Bradley as CEO and Director. Defendant Moyer again touted Defendant Bradley's credentials as a

"technology visionary with the experience of successfully launching multiple publicly traded companies":

> "Nate is a technology visionary with the experience of successfully launching multiple publicly traded companies. I resoundingly welcome him as incoming CEO and director to create value for our shareholders. Datavault has been advancing its technology and strategic relationships since its founding six years ago, building value in the process. Now, we have a more diversified portfolio of assets and broad reach into multiple markets that are expected to exceed $4 billion in annual sales."

35. On February 13, 2025, WiSA announced it had changed its name to Datavault AI. In this press release, Defendant Bradley claimed that the Company was "well-positioned to realize partnering opportunities and grow the business across multiple vertical markets in 2025 and beyond."

36. On May 20, 2025, Datavault AI held its Business Update Conference Call. During this call, Defendant Bradley made several claims concerning the purported importance to the Company of its blockchain marketplace, the Datavault Platform. For example, Defendant Bradley specifically represented that Datavault AI was "the center of [Defendants'] strategy," stating:

> Our business model, as you know, is a licensing company. At the center of our strategy is really this agent platform, the Datavault, which allows you to experience data, view data, see data from all of its sources, taking in data in a Web 3.0 format, where all Web 2.0 formats, such as video and telecom and things that were not traditional data sources, are able to be seen, viewed and experienced within the Datavault.

37. Defendant Bradley further stated that, ***through the Datavault Platform, Datavault AI's customers' "ability to use blockchain to reduce costs and to create value" was "being perfected,"*** referencing the Company's status as "heavily patented in this area" and stating:

> [R]eally, the Datavault Bank capability, which is our ability to issue smart contracts, is a breakthrough capability that we're giving our clients. ***Our clients are now able to distribute not only data objects, but they can create data objects in combination***. They can have the likeness of a student combined with a brand of a school, and then the single object that is remunerating all the parties in the transaction automatically, systematically. This is the blockchain. This is the ability to use blockchain to reduce costs and to create value, for our clientele. And that's being perfected through the Datavault platform. It's something that we've invested heavily in. We're heavily patented in this area. ***We're exclusive to our clients in these areas that we've perfected around our technology.***

38. Defendant Bradley also stated that the Datavault Platform enabled the Company to "monetize" certain technologies they had developed, including "Sumerian crypto anchors" that could purportedly "mark everything from material or textile or piece of clothing or piece of products." Defendant Bradley was firm in affirming the veracity of his claims, stating:

> Sumerian, this can't be overstated. We have with Sumerian crypto anchors, we have an industry first durable, secure, micro, even Nano marking capability, the ability to go down to the molecular level and mark everything from material or textile or piece of clothing or piece of products. We're able to mark physical metals. We can mark individual plastics and other substrates using these molecular markers. We also have perfected a microchip, a micro transponder that allows us to mark everything in an inventory platform. We can mark inside human tissue. We've proven the ability to insert this into glass, into plastic. It survives the heat of molten metal. It can be adhered to bullets, adhered to casings.
>
> ***There's many use cases that we've perfected over the last quarter,*** where we have done bench testing and extreme testing around these marking technologies, and we're extremely excited about the enterprise level that we've reached to monetize these technologies within the Datavault….

39. On July 7, 2025, Datavault AI filed a shelf Registration Statement on Form S-3 with the SEC concerning one or more eventual offerings of Datavault AI securities, including common stock, with an aggregate offering price of up to $250 million. An amendment was filed on July 8, 2025, and the SEC declared the Registration Statement effective on July 9, 2025.

40. On July 15, 2025, Datavault AI filed with the SEC a prospectus on Form 424B3 announcing an offering of 22,728,368 shares of common stock, issuable upon exercise of certain common stock warrants the Company had previously issued: (1) on September 10, 2024, pursuant to exchange agreements between the Company and holders of the warrants issued on that date; (2) on February 13, 2025, pursuant to a placement agency agreement between the Company and an affiliate of Maxim Group LLC; and (3) in connection with a March 31, 2025 securities purchase agreement between the Company and certain of its investors. The July 15, 2025 Prospectus stated that shares in the offering would be sold either at market prices or privately negotiated prices.

41. On July 22, 2025, Datavault AI issued a press release announcing: "Global Defense Contractor Burke Products Selects Datavault AI for Enhanced National Defense and Aerospace Technologies Contracts." In the press release, Datavault AI claimed that its "strategic partnership

with Burke … stands to deliver 2025 Revenues from existing contracts of Burke's that have now been subcontracted to Datavault AI" and that these contracts existed "on a global basis," stating:

> The partnership ***stands to deliver 2025 Revenues from existing contracts*** of Burke's that have now been subcontracted to Datavault AI and is ***set to scale into productized offerings into 2026***. . . .
>
> Within the partnership Datavault AI has been contracted by Burke Products to engineer and produce solutions responsive to an array of opportunities. All opportunities are managed under the contract in a case by case fashion designed to be responsive to private and public RFPs and requests made directly and through subcontracts obtained by Burke and other contracting mechanisms in place at Burke Products on a global basis.
>
> ***Military grade engineering, manufacturing and productization is now underway***. The collaboration aims to advance defense and aerospace capabilities by integrating Datavault AI's services and proprietary data and ADIO® tone technologies with Burke's experienced manufacturing and engineering teams to accelerate productization and speed to market that Datavault AI's technologies have been designed to automate and support at scale.

42. Also in this press release, Datavault AI misleadingly touted the expected U.S. defense budget in 2025 and claimed that the Company was "uniquely positioned to deliver . . . new and innovative solutions" through "technological synergies" given the defense sector's "increas[ed] focus[] on secure data solutions, advanced tracking, and predictive intelligence," stating:

> [G]lobal defense spending is projected to exceed $2.2 trillion in 2025, with the U.S. defense budget alone expected to surpass $900 billion. As modernization efforts escalate, the sector is increasingly focused on secure data solutions, advanced tracking, and predictive intelligence—areas where Datavault AI is uniquely positioned to deliver for Burke new and innovative solutions that solve for advantages and forward progression of technologies in this sector. With Web 3.0 centric contributions of Datavault AI this partnership will explore technological synergies with particular emphasis on secure data management, resource tracking, and communication systems critical to mission success.

43. This release quoted Defendant Bradley as highlighting the purported "international" scale of Datavault AI's partnership with Burke, which Bradley claimed exceeded what he and his co-founder and spouse Sonia Choi envisioned for Datavault AI upon founding it, stating:

> Nathaniel T. Bradley, Co-Founder and CEO of Datavault AI, asserted: "This collaboration marks an international milestone of a scale we couldn't have

> anticipated when we first founded the company. Sonia Choi has been diligently building toward this moment for years, and her ability to identify high-impact applications for Datavault AI's technologies—while guiding our team through the execution with focus and discipline—has been exceptional. Through her vision and leadership, we've reached a breakthrough that aligns seamlessly across our VerifyU, ADIO®, High Performance Computing, WiSA and Datavault platforms, in concert with Burke Products' expansive capabilities, trusted network, and precision-driven engineering excellence. . . .
>
> … Together, with Burke Products, we now have an industry leading, solutions-oriented contracting partner that not only understands Datavault AI's mission, but is equipped to deliver defense-grade, purpose-built innovations when they are most needed. Sonia's and Aaron [Bakshi, CEO of Burke]'s influence will have a lasting impact—not only on Datavault AI's trajectory, but on the broader U.S. defense industry it serves."

44. Also on July 22, 2025, Datavault AI filed with the SEC a Prospectus on Form 424B5 announcing a Registered Offering of common stock of up to $50 million, pursuant to the Company's Registration Statement, effective July 9, 2025.

45. On August 20, 2025, Datavault AI held a conference call to discuss its financial results for Q2 2025, ended June 30, 2025, as reported on the Company's Form 10-Q, filed August 19, 2025. During the call, Defendant Bradley spoke to the excitement around "the ability for Burke Products to name us and select us into a government contracting opportunities around key instruments of both our military complex and administrative aspects of our government," and claimed that Datavault AI's partnership with Burke showed its "ability to monetize inventions."

46. On September 25, 2025, Datavault AI issued a press release announcing that it had purportedly secured "a $150 million strategic investment" from Scilex to "build a supercomputer and launch independent data exchanges" in the United States. The press release stated, in relevant part:

> Datavault AI Inc. . . . a leader in AI-driven data visualization, valuation, and monetization, today announced the execution of a securities purchase agreement for a $150 million strategic investment from Scilex Holding Company (Nasdaq: SCLX). As described below, the investment will be made in two tranches, with an initial tranche of $8,067,000, expected to close on September 26, 2025, and a second tranche of $141,933,000 expected to close following receipt of stockholder approval as described below. The transaction, executed in Bitcoin (BTC) at the spot exchange rate published by Coinbase.com, is expected to strengthen Datavault AI's balance sheet and provide growth capital to ***accelerate its supercomputing***

> ***infrastructure, expand independent data exchanges***, and unlock new revenue streams.

47. On October 23, 2025, Datavault AI issued a press release entitled "Datavault AI Announces Headquarters Relocation to Philadelphia, Expansion of AI and Quantum Centers, and Advisory Board Growth to Fuel Rapid Innovation." Among other items, Datavault AI announced that it had opened its Center for AI and Quantum Computing Excellence, which it claimed consisted of "a state-of-the-art, Class A eight-story glass office building spanning 180,000 square feet on 23 wooded acres" and "is optimized for advanced computing with 22,000-square-foot floor plates ideal for collaborative [research and development ("R&D")]," stating:

> [T]he company has opened its Center for AI and Quantum Computing Excellence at 9040 Roswell Road in Sandy Springs, Georgia—a state-of-the-art, Class A eight-story glass office building spanning 180,000 square feet on 23 wooded acres along the Chattahoochee River. Featuring modern high-speed infrastructure and on-site data centers, the lab is optimized for advanced computing with 22,000-square-foot floor plates ideal for collaborative R&D.

48. On October 28, 2025, Datavault AI issued a press release entitled "Nature's Miracle Crowns Datavault AI with 35% Royalty License with Multi-Million Dollar Global Technology License." Among other items, Datavault AI stated that Nature's Miracle had agreed to license its Carbon Credit Tokenization System, purportedly for a "non-refundable license fee of $2 million and a 35 percent royalty on all gross revenue generated through the licensed technology." The press release further quoted Defendant Bradley as touting the value of this purported agreement, stating:

> "This agreement represents a significant milestone in Datavault AI's ongoing strategy to commercialize our patent portfolio across high-growth industries like sustainability and carbon markets," said Nathaniel Bradley, CEO of Datavault AI. "By licensing our carbon credit tokenization system to Nature's Miracle, we are aligning with a partner whose expertise in innovative, sustainable environmental technology is being applied to accelerate the adoption of blockchain for verified carbon markets." The partnership positions both companies at the forefront of the emerging digital carbon economy by providing a scalable, transparent, and fraud-resistant method for verifying and trading carbon credits.

49. Defendants' statements referenced in ¶¶28-43, 45-48 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance

policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had overstated the size and nature of its announced "Center for AI and Quantum Computing Excellence"; (ii) Defendants had overstated the economic value to Datavault AI of its various corporate partnerships with, e.g., Scilex, Burke, and Nature's Miracle; (iii) Defendants had overstated the volume of trading activity on the Datavault Platform, which was in fact minimal; (iv) the Company's undisclosed connections with Withrow, a convicted felon, when revealed, would cause Datavault AI to incur reputational harm; and (v) as a result, Defendants' public statements were materially false and misleading at all relevant times.

50. On October 31, 2025, Wolfpack Research published the Wolfpack Report, a report concerning Datavault AI. Among other things, the Wolfpack Report warned that Datavault AI was a "stock promotion" that relied on misleading press releases and "empty claims" concerning artificial intelligence, quantum computing, Web 3.0, and data monetization.

51. The Wolfpack Report stated that the Company had vastly overstated the size and nature of Datavault AI's Center for AI and Quantum Computing Excellence, and that Datavault AI's purported partnerships with, *e.g.*, Burke, Scilex, and Nature's Miracle could not offer the economic upside that Defendants claimed they would. As to Burke, Wolfpack stated that Defendants' claim that Burke is a "[g]lobal [d]efense [c]ontractor" was misleading given that Burke "has never been awarded more than $4.5 million in contracts in any given year going back to 2002" and had only been awarded $3.1 million in contracts in 2025, by the time Wolfpack published its report.

52. The Wolfpack Report further noted that Burke's contracts concerned "run-of-the-mill equipment such as hoses, piping, fuses, and electrical connectors," a far cry from the "secure data solutions, advanced tracking, and predictive intelligence" that Datavault AI stated it would be "uniquely positioned to deliver for Burke new and innovative solutions." As to Scilex, Wolfpack noted that even though Datavault AI claimed Scilex would provide it with a "$150 million strategic investment," Scilex had a market cap of less than $150 million and had just $4.1 million of cash and cash equivalents. As to Nature's Miracle, Wolfpack stated that Datavault AI's claim that Nature's Miracle would pay the Company a $2 million licensing fee seemed dubious at best, given

that Nature's Miracle reported only $9,511 in cash as of its Q2 2025 Form 10-Q, the last one issued before Datavault AI announced its purported partnership with Nature's Miracle.

53. The Wolfpack Report further contended that the Datavault Platform was far less active than Defendants' public statements suggested, and that "[t]rading activity on the platform appears to be minimal, if not non-existent," stating:

> It takes almost no effort to discover that [Datavault AI]'s "blockchain" powered platform, Data Vault, is a joke. We signed up and found that much of the "data" for sale are NFTs [non-fungible tokens], like photos of Dr. Oz, Vladmir [sic] Putin vomiting, and a Dean's List token for a community college. Trading activity on the platform appears to be minimal, if not non-existent. The last known data for sale on the exchange appears to have been uploaded by DVLT employees attempting to sell widely available historical weather data.

54. Finally, the Wolfpack Report raised concerns about Datavault AI's leadership and affiliations, including the alleged connections with a convicted felon, Withrow, and Defendant Bradley's SEC charges, fine, and 3-year ban. As highlighted in the Wolfpack Report, Datavault AI's website omitted Defendant Bradley's past tenure as Chief Technology Officer of Parallax, during which the SEC charged Defendant Bradley with falsely claiming that Parallax "would have a Covid-19 test 'available soon' and personal protective equipment available for 'immediate sale'" when Parallax was in fact insolvent and unable to deliver on Defendant Bradley's claims. Defendant Bradley ultimately consented to a judgment requiring him to pay a $40,000 civil penalty and prohibiting him "for three years from participating in an offering of penny stock." Second, Wolfpack noted that Defendant Bradley was listed with Withrow as an inventor on "multiple" Data Vault Holdings patents, and that Withrow had pled guilty to making false statements upon being charged with participating in a pump and dump scheme during his ownership of Parallax Diagnostics, Inc., before it became Parallax and employed Defendant Bradley.

55. On this news, Datavault AI's stock price fell 19.44%, $0.49 per share, to close at $2.03 per share on October 31, 2025.

56. Defendants, however, continued to issue false and misleading statements and made material omissions regarding its business prospects, sources of revenue, and capital structure.

57. On February 17, 2026, Defendants issued a press release titled "Datavault AI Updates Revenue Estimates by Approximately 30% at $38M to $40M," furnished as Exhibit 99.1

to a Current Report on Form 8-K. Defendants stated that fiscal year 2025 revenue was "estimated to be $38 to $40 million, exceeding its prior estimate of $30 million by up to 33%," and "attributed this revenue growth to its customer tech-licensing fees, and its Data Science Group's tokenization and monetization services." Defendant Bradley was quoted stating:

> Exceeding our earlier FY 2025 revenue estimate by 30%, at the midpoint, while maintaining our ambitious $200 million target for FY 2026 reflects both ***the mission-critical nature of our platform and the operational leverage we've built. . . .*** 2025 was marked by numerous new customer wins spanning a wide spectrum of industries. . . . We expect high rates of customer retention in 2026.

58. On March 18, 2026, Defendants filed the Company's annual report on Form 10-K. In Note 2 to the consolidated financial statements, captioned "Liquidity," Defendants stated that "***management believes the Company has sufficient liquidity to meet its obligations as they become due for at least the next twelve months***," and that "management has concluded that substantial doubt about the Company's ability to continue as a going concern ***has been alleviated***…."

59. On March 19, 2026, Defendants issued a press release entitled "Datavault AI Reports First Profitable Quarter, Record Revenue Growth, and Reiterates $200M (~400% YoY Growth) Full Year 2026 Revenue Target," furnished as Exhibit 99.1 to a Current Report on Form 8-K. Defendants stated that "[t]he Company posted its first-ever profitable quarter," that it "[r]ecorded Net Profit for the first time in the Company's history with $661 thousand for the fourth quarter ended December 31, 2025," and that revenue "increased to $39.1 million for the fiscal year ended December 31, 2025 . . . meeting expectations set by management."

60. In the same press release, Defendants stated that the Company "reported its strongest year-end balance sheet ever, with approximately $116 million in working capital including $142.9 million in current assets, only $26.9 million in current liabilities, and no long-term debt." Defendant Bradley was quoted stating that "2025 was about laying the foundation with industry leading strategic partners and ensuring a strong balance sheet."

61. On April 27, 2026, Defendants issued a press release entitled "Datavault AI Announces Execution of Binding Term Sheet for $120 Million Cash Contribution From Scilex

Holding Company to Fund 100-City GPU Expansion of Quantum-Ready SanQtum Platform," furnished as Exhibit 99.1 to a Current Report on Form 8-K. Defendants stated:

> Combined with the anticipated sale of the BTC and Receivable collections, ***Datavault AI projects $200M+ infusion of cash without equity dilution***.

62. Defendant Bradley was quoted in the same release stating that the Scilex contribution "will provide the capital required to execute our vision for the quantum-ready edge network without diluting our shareholders."

63. Defendants' April 27, 2026 statements were materially false and misleading when made because the Company had not secured a binding commitment for $120 million or for any other amount. Defendants had no reasonable basis to represent that the Company would receive a "$200M+ infusion of cash without equity dilution," and knew or recklessly disregarded that the Company would be required to raise capital through the dilutive issuance of common stock.

64. Six days later, on May 3, 2026, Defendants entered into a securities purchase agreement providing for the sale of 109,090,910 shares of Datavault AI common stock at $0.55 per share, which was announced before the start of trading on May 4, 2026. The offering price represented a discount of approximately 26% to the Company's closing price of $0.7438 per share on May 1, 2026, the last trading day before the announcement. The share count represented an increase of roughly 18% in the Company's outstanding common stock.

65. The market thus learned that the "$200M+ infusion of cash without equity dilution" Defendants had projected one week earlier was not available, that the "Binding Term Sheet" bound no one, and that the Company would instead fund itself by selling a large block of stock at a steep discount to market.

66. On this news, the price of Datavault AI common stock declined approximately 24.7%, falling $0.1838 per share from May 1, 2026 to close at $0.56 per share on May 4, 2026, on volume of more than 237 million shares.

67. On May 15, 2026, Defendants stated that the Company's "[b]alance sheet [was] strengthened following $60 million registered offering of common stock, bringing working capital up to approximately $140 million." Defendants repeated the representation on June 1, 2026, stating

that the "$60 million registered direct offering closed, bringing working capital to approximately $140 million."

68. Defendants thereafter continued to misrepresent the Scilex partnership and the Company's capital and liquidity position. On May 15, 2026, Defendants confirmed that among the "First Quarter 2026 Business Highlights," the Company had "[s]ecured additional $120 million in non-dilutive funding." Just days later, however, on June 4, 2026, Defendants described the identical funds as being "anticipated" from Scilex. No portion of the $120 million has ever been received, and on this news, the price of Datavault AI common stock fell 12.2%, falling to close at $0.5146 on May 15, 2026.

69. On July 22, 2026, Datavault AI announced that it would host its first Analyst & Investor Day on August 4, 2026. According to Defendant Bradley, the Analyst and Investor Day would be "an important milestone in Datavault AI's evolution," during which the Company would demonstrate "how our integrated technology platform will combine artificial intelligence, blockchain and cybersecurity into a unified ecosystem" and would "provid[e] investors with a firsthand look at the technologies that we expect will define the future of digital commerce."

70. Then, without public notice or explanation, Datavault AI failed to proceed with its Investor Day, removing the Investor Day press release from the Company's website. As a result, the price of Datavault AI common stock fell 23.96%, closing at $0.2825 on August 5, 2026.

71. Before the market opened on August 19, 2026, Defendants issued the Company's Q2 2026 results and filed its quarterly report on Form 10-Q for the quarter ended June 30, 2026. The Company announced poor results, including a loss of $0.12 per share, far worse than the expected $0.03 loss, and a net loss of $88 million for Q2 2026, more than twice the $37.1 million loss reported a year earlier.

72. In discussing the results, Defendants revealed that, despite their prior assurances, they were still in the process of "assembling the technology, infrastructure and strategic capabilities required to bring Datavault AI's platform to market at scale," that only recently had "the foundation of [Datavault AI's] platform" taken shape, "the core platform buildout" was still

underway, and the Company would not be launching its exchanges or "converting our contracted opportunities into commercial activity and recognized revenue" until the second half of 2026.

73. The Company also announced that its net cash and liquidity position ***"raise[s] substantial doubt about the Company's ability to continue as a going concern for the twelve months from the date that the financial statements are issued***. . . . As a result, ***the substantial doubt about the Company's ability to continue as a going concern has not been alleviated***."

74. On this news, the price of Datavault AI common stock declined approximately 23.40%, or $0.0905 per share, from a close of $0.3867 per share on August 18, 2026 to a close of $0.2962 per share on August 19, 2026, on volume of more than 201 million shares, approximately ten times the average daily volume over the preceding three weeks.

75. Defendants' statements, referenced in ¶¶28-43, 45-48, 57-65, 67-69, were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had overstated the economic value to Datavault AI of its various corporate partnerships with, e.g., Scilex, Burke, and Nature's Miracle; (ii) Defendants had overstated the status and volume of trading activity on the Datavault Platform, which was in fact minimal; (iii) Defendants had misrepresented the Company's working capital and liquidity position, and the Company's ability to continue as a going concern had not been alleviated; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

76. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**B. Regulation S-K Item 105**

77. Throughout the Class Period, Datavault AI's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations. Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"),

required Datavault AI to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered." Defendants failed to disclose, inter alia, the true economic value of the Company's purported partnerships with *inter alia* Burke, Scilex, and Nature's Miracle; the true level of trading activity on the Company's Datavault Platform, and Defendant Bradley's connections with convicted felon Withrow. Defendants' failure to disclose the foregoing issues violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

## IV. ADDITIONAL SCIENTER ALLEGATIONS

78. During the Class Period, Defendants had both the motive and opportunity to commit fraud, and they acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued or disseminated to the investing public during the Class Period were materially false or misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as well as actions intended to manipulate the market price of Datavault AI common stock, as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Datavault AI and their control over, receipt, and/or modification of Datavault AI's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

79. Given their positions within Datavault AI, the Individual Defendants controlled the contents of the Company's public statements during the Class Period. The Individual Defendants were each provided with, or had access to, the statements alleged herein to be false and misleading prior to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. And because of their positions and access to material nonpublic information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were false and misleading. Each of the Defendants

is responsible for the accuracy of Datavault AI's corporate statements, and is, therefore, responsible and liable for the representations contained therein.

## V. LOSS CAUSATION

80. Plaintiff and other Class members were damaged as a result of Defendants' fraudulent conduct as alleged herein. During the Class Period, Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations, and omitting material facts and uncertainties required to be disclosed, relating to Datavault AI's operations, business, financial performance, and prospects.

81. As a direct result of Defendants' scheme, misrepresentations of material fact, and omissions of material fact, the price of Datavault AI common stock was artificially inflated throughout the Class Period.

82. Class members unknowingly and in reliance on Defendants' materially false or misleading statements and/or omissions purchased Datavault AI common stock at artificially inflated prices on the NASDAQ. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiff and other Class members would not have purchased Datavault AI common stock at the artificially inflated prices at which it traded during the Class Period.

83. The truth about Defendants' fraud was revealed through corrective disclosures made on and between October 31, 2025, May 3, 2026, May 15, 2026, August 4, 2026, and August 19, 2026. In response to these corrective disclosures, the price of Datavault AI common stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct was removed from Datavault AI's stock price.

84. This decline in Datavault AI's stock price following the corrective disclosures is directly attributable to the market absorbing information that disclosed the falsities in or misleadingly omitted from Defendants' material misrepresentations and omissions.

85. Plaintiff and other Class members suffered economic losses as the price of Datavault AI's stock fell in response to the corrective disclosures. It was foreseeable that such disclosures would cause Datavault AI's stock price to decline. Thus, Defendants' wrongful

conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and other Class members.

## VI. NO SAFE HARBOR

86. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Datavault AI who knew that those statements were false when made.

## VII. PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

87. At all relevant times, the market for Datavault AI common stock was an efficient market for the following reasons, among others:

(a) Datavault AI common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

(b) as a regulated issuer, Datavault AI filed periodic public reports with the SEC;

(c) Datavault AI regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Datavault AI was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers

of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

88. As a result of the foregoing, the market for Datavault AI common stock promptly digested current information regarding Datavault AI from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Datavault AI common stock during the Class Period suffered similar injury through their purchases of Datavault AI common stock at artificially inflated prices, and a presumption of reliance applies.

89. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VIII. PLAINTIFF'S CLASS ACTION ALLEGATIONS

90. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Datavault AI securities during the Class Period and were damaged upon the revelation of the alleged corrective disclosures (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

91. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Datavault AI securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can

be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Datavault AI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

92. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

93. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

94. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Datavault AI;

(c) whether the Individual Defendants caused Datavault AI to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Datavault AI securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

95. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

96. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) Datavault AI securities are traded in an efficient market;

(d) the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company's shares traded on the NASDAQ and were covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(g) Plaintiff and members of the Class purchased, acquired and/or sold Datavault AI securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

97. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

98. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### For Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

99. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

100. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

101. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Datavault AI securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Datavault AI securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

102. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Datavault AI securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Datavault AI's finances and business prospects.

103. By virtue of their positions at Datavault AI, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants

acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

104. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Datavault AI, the Individual Defendants had knowledge of the details of Datavault AI's internal affairs.

105. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Datavault AI. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Datavault AI's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Datavault AI securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Datavault AI's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Datavault AI securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

106. During the Class Period, Datavault AI securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Datavault AI securities at prices artificially inflated by Defendants' wrongful conduct. Had

Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Datavault AI securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Datavault AI securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

107. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

108. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### For Violation of § 20(a) of the Exchange Act Against the Individual Defendants

109. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

110. The Individual Defendants acted as controlling persons of Datavault AI within the meaning of Section 20(a) of the Exchange Act. By reason of their positions within the Company, and their ownership of Datavault AI stock, the Individual Defendants had the power and authority to cause Datavault AI to engage in the wrongful conduct complained of herein. Datavault AI controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

(c) Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

DATED: September 25, 2026

*/s/ Michael Dell'Angelo*
Michael Dell'Angelo

**BERGER MONTAGUE PC**
Michael Dell'Angelo (PA Bar No. 80910)
Andrew D. Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net
aabramowitz@bm.net

**SCHALL, BROWN & SCHWARTZ LLP**
Andrew J. Brown
Brian O. O'Mara
501 W. Broadway, Suite 1490
San Diego, CA 92101
Telephone: (310) 301-3335
andrew@schallfirm.com
omara@schallfirm.com

**SCHALL, BROWN & SCHWARTZ LLP**
Brian J. Schall
Adam Rosen
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
brian@schallfirm.com
adam@schallfirm.com

Attorneys for Plaintiff